MAGRETA *v.* AMBASSADOR STEEL COMPANY.

1. WORKMEN'S COMPENSATION—SPECIFIC LOSS BENEFITS—2-STAGE AMPUTATION OF LEG.

   A claimant for workmen's compensation benefits, whose leg is amputated in two stages, first by guillotine amputation of the foot and then by definitive amputation 5 inches below the knee, has suffered only one specific loss, the loss of a leg, and therefore is entitled only to specific loss benefits for loss of a leg (CLS 1961, § 412.10).

2. STATUTES—CONSTRUCTION.

   A statute containing evidence of semantic difficulties must be construed so as to avoid absurdity.

3. SAME—CONSTRUCTION—INTENT.

   An inartfully drawn statute must be construed so as to accomplish best the objective sought by the legislature in adopting it.

4. WORKMEN'S COMPENSATION—SPECIFIC LOSS BENEFITS—INCAPACITY TO WORK—PRESUMPTIONS.

   Award of specific loss benefits provided by the workmen's compensation act is not dependent upon evidentiary proof of incapacity for work, total or partial, resulting from the loss of any of the specified anatomical members, since such incapacity is conclusively presumed upon suffering any of the specified schedule losses (CLS 1961, § 412.10).

5. SAME—INTENT OF LEGISLATURE—PAYMENT FOR INJURY—INCAPACITY FOR WORK.

   The legislature's general pattern in the workmen's compensation act was to make benefits payable upon a showing of the consequent incapacity for work due to job-related physical injury (PA 1912 [1st Ex Sess], No 10, as amended).

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 58 Am Jur, Workmen's Compensation § 293 *et seq.*
[2] 50 Am Jur, Statutes §§ 377, 378.
[3] 50 Am Jur, Statutes § 223 *et seq.*
[4, 5, 9] 58 Am Jur, Workmen's Compensation § 281 *et seq.*
[6–8] 58 Am Jur, Workmen's Compensation § 287 *et seq.*
[10–14] 58 Am Jur, Workmen's Compensation § 284 *et seq.*
[15] 58 Am Jur, Workmen's Compensation § 530 *et seq.*
   5 Am Jur 2d, Appeal and Error § 712.
[16] 5 Am Jur 2d, Appeal and Error § 1009.

6. Same—Appeal—Loss of Leg Includes Loss of Foot—Two Amputations.

Finding of appeal board that plaintiff, who suffered a single injury to his right leg on which two amputations, separated in time by 3 months, were performed, the first of which severed plaintiff's foot and the second of which severed the leg just below the knee, was entitled to specific loss benefits under the workmen's compensation act for the loss of the leg only and not for the loss first of a foot, then of the leg, *held*, amply supported by the record (CLS 1961, § 412.10).

7. Same—Loss of Toe—Specific Loss Benefits—Statute.

Appeal board's award to plaintiff of benefits for specific loss of one-half of the left great toe, based on the mistaken belief that unless some part of the bone of a phalange is removed, there is no loss of a phalange within the meaning of the workmen's compensation act, *held*, reversible error, since the statute requires payment for the loss of the entire toe whenever more than one phalange, whether of bone or cartilage, is lost, and in this case the record shows that the articular cartilage of the proximal phalange was removed when the entire distal phalange was amputated (CLS 1961, § 412.10).

8. Same—Statute—Construction—Minimum and Maximum Benefit Limitations.

The language incorporating maximum and minimum benefit limitations in section of the workmen's compensation act relating to compensation payable for partial incapacity applies to those disabilities referred to in the immediately preceding section concerned with total incapacity for work, for which compensation is payable in such preceding section (CLS 1961, §§ 412.9, 412.10).

9. Same—Basic Compensation Rate for All Injuries.

The basic compensation rate for all types of injuries is two-thirds of the loss of wage-earning capacity (CLS 1961, §§ 412.9, 412.10).

10. Same—Maximum Benefits Limitations—Number of Dependents.

Except for specific loss injuries, for which benefits are paid for loss of the anatomical member, maximum limitations determined by the number of claimant's dependents are expressly imposed by the workmen's compensation act upon the weekly benefits payable for incapacity for work, whether partial or total and, as to the latter, whether temporary or permanent (CLS 1961, §§ 412.9, 412.10).

11. SAME—MINIMUM BENEFIT LIMITATIONS—TOTAL INCAPACITY FOR
    WORK.
      Provision for a *minimum* weekly benefit limitation in recognition
        of the need in such cases to provide at least a minimum sub-
        sistence level of workmen's compensation benefits for an in-
        jured employee whose average weekly wage before injury was
        small is made only in the case of total incapacity for work
        (CLS 1961, § 412.9).

12. SAME—MINIMUM BENEFIT LIMITATIONS.
      Minimum benefit limitations are omitted from the section of the
        workmen's compensation act relating to partial incapacity and
        from its schedule of specific losses since such injured employees
        should be able theoretically to earn some wages after injury,
        and the need for a minimum subsistence level of benefits is less
        apparent (CLS 1961, § 412.10).

13. SAME—MAXIMUM AND MINIMUM BENEFIT LIMITATIONS.
      The scheme of compensation benefits devised by the legislature
        in the workmen's compensation act imposes maximum limita-
        tions determined by the number of a claimant's dependents
        upon all weekly benefits except for specific losses, and imposes
        minimum limitations similarly determined, only upon weekly
        benefits for total incapacity (CLS 1961, §§ 412.9, 412.10).

14. SAME—SPECIFIC LOSS BENEFIT—RATE—NUMBER OF DEPENDENTS.
      Weekly specific loss benefit rate of plaintiff who lost leg in an
        industrial accident under the workmen's compensation act is
        66–2/3% of his average weekly wages before injury, neither
        diminished nor enlarged because of the number of his depend-
        ents, whatever the number of his dependents at the time of
        the injury and whatever the subsequent change therein .(CLS
        1961, §§ 412.9, 412.10).

15. SAME—SUPREME COURT NOT BOUND BY STIPULATIONS OF PARTIES
    —MISTAKES OF LAW.
      Supreme Court is not bound in appeal from workmen's com-
        pensation appeal board by stipulations of parties before
        referee, reflecting a misinterpretation of applicable law, and
        is not precluded by such stipulations from disposition of the
        controversy in accordance with the law as the Court con-
        strues it.

16. COSTS—WORKMEN'S COMPENSATION—NEITHER PARTY PREVAILING.
      No costs are awarded in appeal from workmen's compensation
        appeal board granting claimant specific loss benefits, each
        party having prevailed in part.

Appeal by leave granted from Court of Appeals, Division 2; Quinn, P. J., and T. G. Kavanagh and McGregor, JJ., order denying leave to appeal from an order of the Workmen's Compensation Appeal Board. Submitted October 6, 1966. (Calendar No. 8, Docket No. 51,371.) Decided March 7, 1967. Limited rehearing granted July 21, 1967. Decided on rehearing 380 Mich 513.

Francis A. Magreta presented his claim for workmen's compensation benefits against Ambassador Steel Company, a Michigan corporation, and General Accident Assurance Corporation, a foreign corporation, for injuries to one foot and for loss of a leg. Benefits modified by appeal board. Leave to appeal denied by Court of Appeals. Plaintiff appeals. Affirmed in part, reversed in part and remanded for further proceedings. Reversed on rehearing.

*Kelman, Loria, Downing & Schneider* (*Donald W. Loria,* of counsel) for plaintiff.

*LeVasseur, Werner, Mitseff & Brown* (*Norman J. LeVasseur,* of counsel), for defendants.

*Amici Curiae:*

Michigan Self-Insurers Association, Inc., by *Stanley E. Beattie* and *Buell Doelle.*

Aetna Casualty & Surety Company, American Insurance Association, American Mutual Insurance Alliance, Auto-Owners Insurance Company, Citizens Mutual Automobile Insurance Company, Employers Mutual of Wausau, Liberty Mutual Insurance Company, Michigan Mutual Liability Company, Michigan State Accident Fund, and Travelers Insurance Companies, by *Charles H. King.*

Western Casualty & Surety Company, by *Alexander, Buchanan & Conklin (Donald G. Ducey* and *R. L. Benham, Jr.,* of counsel).

International Union, UAW, by *Stephen I. Schlossberg, John A. Fillion, Bernard F. Ashe, Jordan Rossen,* and *Michael Friedman.*

Souris, J.   Three distinct appellate issues requiring our construction of our workmen's compensation act[1] are presented by this appeal.[2]   First, we must determine whether an employee injured in the course of his employment is entitled to cumulative specific loss awards for loss of a leg and also for loss of the foot of that leg when, in an effort to save as much of the leg as was medically possible, a guillotine amputation of the foot was performed and subsequently a definitive operation above the foot but below the knee was performed.   Second, we must determine whether the employee is entitled to a specific loss award for loss of an entire toe from his other foot when the toe's distal phalange and, in addition, the articular cartilage of the proximal phalange are removed as a result of his injuries.   Third, we must determine whether specific loss awards are subject to the maximum and minimum limitations imposed upon benefits awarded claimants for total incapacity, under part 2, § 9 of the act,[3] and to the maximum limitations imposed upon benefits for partial incapacity, under part 2, § 10 of the act,[4] which limitations are determined by the number of claimant's dependents.

---

[1] PA 1912 (1st Ex Sess), No 10, as amended (CL 1948, § 411.1 *et seq.,* as amended [Stat Ann 1960 Rev and Stat Ann 1965 Cum Supp § 17.141 *et seq.*]).

[2] The Court of Appeals denied plaintiff's application for leave to appeal from orders of the workmen's compensation department's appeal board modifying decisions previously made by a referee.   Upon plaintiff's application for leave to appeal here, we granted leave.

[3] CLS 1961, § 412.9 (Stat Ann 1960 Rev § 17.159).

[4] CLS 1961, § 412.10 (Stat Ann 1960 Rev § 17.160).

Plaintiff Magreta sustained two injuries while in defendant's employment on March 13, 1958, when a bundle of steel fell upon him. Part of his left great toe was severed by the bundle and his right foot was severely crushed. He was taken to a hospital immediately where the entire distal phalange of the injured left great toe, including some of the articular cartilage of the proximal phalange, was amputated and the crushed right foot was debrided and closed. Two days later gangrene developed in his right foot necessitating a guillotine amputation at a point three inches above the ankle and more than seven inches below the tibial plateau. Three months later, on June 17, 1958, a definitive amputation was performed about five inches below the right knee.

Defendant voluntarily paid weekly compensation to plaintiff from March 14, 1958, to April 26, 1962, the period provided by our statute for compensation for the specific loss of a leg. See part 2, § 10. Plaintiff thereafter filed an application with the workmen's compensation department for hearing and adjustment of claim[5] for payment of additional benefits for loss of his right foot and for loss of his left great toe. At the hearing before the referee in March of 1963, the parties stipulated that the number of plaintiff's dependents decreased from four to three on December 8, 1959, and that, as a consequence, the weekly compensation to which plaintiff was entitled thereafter was $51 rather than the $57 defendant voluntarily had paid him. The referee awarded plaintiff benefits for 162 weeks for the specific loss of his right foot and for an additional 215 weeks for the specific loss of his right leg. Notwithstanding the parties' stipulation, the weekly benefits awarded plaintiff were for $57 for all of both periods. Defendant, of course, was granted

_____

5 CL 1948, § 413.7 (Stat Ann 1960 Rev § 17.181).

credit for compensation previously paid voluntarily. The referee's decision omitted any reference to plaintiff's claim for benefits for specific loss of his left great toe.

Defendant appealed the referee's decision to the appeal board and plaintiff filed a cross-appeal. The appeal board vacated the referee's award for loss of the right foot; awarded plaintiff benefits for 16-1/2 weeks for the specific loss of one-half of his left great toe, payment thereof commencing as of March 13, 1958; and modified the referee's award for the specific loss of plaintiff's right leg to reflect the stipulated decrease in the number of plaintiff's dependents, payment thereof to commence as of the expiration of the 16-1/2 week period for payment of the toe award. The appeal board, like the referee, ordered that defendant be credited for compensation previously paid voluntarily.

## I.

We conclude that, under circumstances such as are disclosed by this record, a claimant whose leg is amputated, as defined by part 2 § 10 of the act, in two stages, first by guillotine amputation of the foot and then by definitive amputation five inches below the knee, has suffered only one specific loss, the loss of a leg, and, therefore is entitled only to specific loss benefits for such loss of a leg. The definition to which reference has been made reads as follows:

"An amputation between the knee and foot 7 or more inches below the tibial table (plateau) shall be considered a foot, above that point a leg."

Leaving aside semantic difficulties with the statutory language, we must construe the statute to

avoid absurdity.[6] *Williams* v. *Secretary of State*
(1953), 338 Mich 202, 208. That end is accomplished
best by constant regard for the objective sought by
the legislature in providing for specific loss benefits
for loss of anatomical members.

Award of specific loss benefits provided by the
act is not dependent upon evidentiary proof of in-
capacity for work, total or partial, resulting from
the loss of any of the specified anatomical members.
Indeed, such incapacity is presumed conclusively
upon suffering any of the specified schedule losses.
The legislature has so provided in the following
language which introduces the schedule of specific
losses appearing in part 2, § 10 of the act:

"In cases included by the following schedule, the
disability in each such case shall be deemed to con-
tinue for the period specified, and the compensation
so paid for such injury shall be as specified therein,
to-wit:"

Thus, while maintaining semantic consistency
with the act's general pattern, which makes ben-
efits payable upon a showing of the consequent in-
capacity for work due to job-related physical injury,
the legislature's purpose in cases of loss of the
scheduled anatomical members was to require com-
pensation upon a showing, only, of such job-related
physical loss. The question becomes, therefore,
what was the anatomical member lost by claimant
in this case for which he is entitled to payment of
benefits?

Plaintiff suffered a single injury to his right leg.
Two amputations, separated in time by three
months, were performed. The first severed plain-

---

[6] As quoted, the language is inartful. The statutory context con-
sidered, we read the quoted language to mean:

"An amputation between the knee and foot 7 or more inches below
the tibial table (plateau) shall * * * [constitute the loss of]
a foot, above that point [the loss of] a leg."

tiff's foot and the second severed the leg just below
the knee.  There was evidence that both amputa-
tions were required as a matter of routine surgical
practice in the comprehensive treatment of plain-
tiff's injury.[7]  There was no evidence challenging

---

[7] "Q. [Mr. Loria] Now, on March 15, 1958, as I understand it,
you performed surgical amputation of his right foot?

"A. [Dr. Castle] Yes.  *  *  *

"Q. About how many inches below the tibial plateau?

"A. Oh gosh, it varies per person.  It would be, say, three inches
above the ankle.  *  *  *

"Q. That would have been more than seven inches below the
tibial plateau?

"A. Yes.

"Q. Now, as I understand it, the reason that you did this am-
putation was because gangrene had set in in that foot?

"A. Yes.

"Q. How high was the gangrene?

"A. It was patchy throughout the foot, so it was obvious.

"Q. There was no gangrene indicated at that time above the
ankle?

"A. No.  That's right.

"Q. If there had been you would have amputated the leg at that
time?

"A. I would have taken all the gangrenous portions out, that's
right.

"Q. Now, on March 15, 1958, if we can go back to that time and
try to get into your mind, it was your intention, was it not, to save
as much of the leg as possible?

"A. That is true.

"Q. And it would be possible, for instance, that if infection did
not set in above the leg—above the ankle, I'm sorry—if gangrene
didn't set in and infection didn't set in that it may have been
possible to not have to do any further amputations beyond that
what you did on March 15, 1958?

"A. No, that is a temporary procedure.  The guillotine is a tem-
porary operation, it would have to be revised later.

"Q. Now, could it have been revised one inch, or two inches, or
three inches higher than the site that you amputated on March 15,
1958?  I mean, could there be variations in where the next amputa-
tion would be?

"A. At the site of election, which is approximately five to six
inches below the tibial plateau; it fits an artificial leg better, and
function is better.  If you get much below that, for instance in the
lower third of the leg, the skin does not hold up and they get sores
and ulcers on their artificial limb, so they elect to do it the place
where it works the best, and that's in that area.  So, we would have
done it in the same place if we possibly could no matter what the
condition of the guillotine.

"Q. Well, can you explain why that would not have been done on
March 15, 1958, that is, the amputation?

"A. I was afraid of infection, and he had blisters throughout the
area, and I didn't know exactly what was going to happen to this

the reasonableness of such practice in the medical circumstances of plaintiff's case. The appeal board's finding that plaintiff's loss must be regarded as the loss of a leg only and not the loss, first, of a foot and, then, of the leg is supported amply by the evidentiary record. We do not read the statute to mean that in such circumstances the injured worker

---

limb; it was only a couple of days old from the injury, and I was afraid some other part might become gangrenous, and this was the safest thing to do.

"*Q.* Well, let's take those two or three reasons that you've given. If gangrene had extended only, let's say, in the foot at that point it certainly wouldn't do any harm to amputate five or six inches below the knee insofar as the gangrene situation? That wouldn't make it any worse, would it?

"*A.* No, that's right.

"*Q.* So that we can eliminate the possibility of gangrene going further as a reason for delaying the—

"*A.* Well, you can't be sure. That has to be a clinical judgment, or, surgical judgment at the time, but he had big blisters throughout the area on his skin, and I was just afraid if I did the infinitive [*sic*, definitive?] operation he would get an infection and a week or two later I would be amputating him above the knee, so this was the conservative and safest thing to do. \* \* \*

"*Q.* In fact, if things had worked out medically so that after your operation of March 15, 1958, Mr. Magreta's condition was adequately found, that is, he had no infection, no trouble, you had a completely successful operation of the foot, it may have been possible that you would have decided against a further amputation?

"*A.* No sir.

"*Q.* All right. At the point where you did the amputation at the ankle, or, around the ankle joint, is there any—do people have amputation of their limbs at that point, I mean for their whole life?

"*A.* Almost never. Such an operation at that side does not wear well, it would break down and have to be revised higher. \* \* \*

"*Re-direct Examination*

"By Mr. LeVasseur:

"*Q.* Doctor, what is the significance of the word guillotine as used in the operation you performed on the man's foot?

"*A.* It is used to describe the technique more or less as if it were cut off by the blade of a guillotine.

"*Q.* Do you ever do a definitive operation in the same way as a guillotine operation?

"*A.* No, sir.

"*Q.* Do you always have to revise a guillotine operation?

"*A.* Almost always. Now, with one qualification: Occasionally during the war, especially, we found that a few of these would close over at the site of election, and they would go ahead and function with that technique, but it is not considered a definitive type operation, it's a temporary type operation."

is entitled to cumulative specific loss benefits as claimed by plaintiff.

The only pertinent authority relied upon by plaintiff on this issue is *Wilson* v. *McCabe & Dishaw* (1936), 274 Mich 74. In *Wilson* this Court affirmed an award for loss of a hand by amputation, necessitated, the Court said the department was entitled to find from the evidence, by an industrial injury suffered several years earlier. The defendant claimed the award should have been reduced by the amount it voluntarily had paid plaintiff less than two years earlier when one finger of plaintiff's injured hand was amputated. The Court rejected defendant's claim and affirmed the department's award for full benefits for the plaintiff's specific loss of a hand. While it is possible to read this Court's opinion in *Wilson* in support of plaintiff's claim here, it is quite clear that the Court did not articulate any reasoning by which it reached its result and upon which we now can rely. Furthermore, it only assumed the voluntary payment was for loss of a finger, but the claim made by plaintiff from which the voluntary settlement resulted was planted on three grounds: total disability, loss of use of hand, and loss by amputation of one finger. Finally, the voluntary payment, while made in settlement of a claim filed by the employer with the department, was never approved by the department nor was the settlement agreement ever submitted therefor to the department. We do not regard *Wilson* as precedent in support of this plaintiff's claim in this appeal for an additional award for specific loss of his right foot.

## II.

The appeal board awarded plaintiff benefits for the specific loss of one-half of the left great toe.

There was evidence from which it could have found, as it apparently did, that none of the bone of the proximal phalange was removed during amputation of the entire distal phalange of the toe.[8] In the mistaken belief that unless some part of the bone of a phalange is removed there is no loss of a phalange within the meaning of the act, the appeal board concluded that plaintiff was entitled only to specific loss benefits for loss of the first, the distal, phalange.

However, the statute, part 2, § 10, provides:

"The loss of more than 1 phalange shall be considered as the loss of the entire toe;  *  *  *  *  "

Dr. Castle, defendant's witness, testified on cross-examination that the articular cartilage of the proximal phalange was removed when the entire distal phalange was amputated.[9] We read the quoted portion of the statute to require payment for the loss of the entire toe whenever more than one phalange, whether of bone or of cartilage, is lost. The order of the appeal board awarding benefits for the loss of half only of plaintiff's toe must be reversed for correction in accordance with our decision on this issue upon remand.

---

[8] "Q. [By Mr. LeVasseur] Doctor, is there a difference between bone and cartilage?
"A. Yes, sir.
"Q. As I understand it, the entire bone of the proximal phalanx remains in this particular case?
"A. Essentially so. It's almost impossible, of course, to remove the cartilage without taking a little bit of bone, but essentially so."
[9] "Q. Was there any portion of the—what phalanx is it after the distal phalanx?
"A. Proximal.
"Q. Proximal phalanx? There are only two phalanges, right?
"A. Yes.
"Q. The proximal phalanx, was there any part of that that was amputated?
"A. Yes, the articular cartilage.
"Q. Some part of the proximal phalange was amputated?
"A. Yes, the cartilage portion, the smoothest portion of the joint."

### III.

Finally, it is claimed that plaintiff's award of specific loss benefits must be reduced as of December 8, 1959, to reflect a reduction in the number of his dependents occurring on that date. The parties stipulated before the referee that such reduction in the number of dependents then occurred and that the plaintiff's weekly benefit rate, as a consequence, thereafter would be $51. On appeal here plaintiff claims that no such stipulations were made before the appeal board, where the matter was heard *de novo,* and that, consequently, he should not be bound thereby. It is plaintiff's claim, also, that the statute does not require a reduction in a specific loss benefit upon reduction of the number of a claimant's dependents during the period benefits are payable. The defendant, on the other hand, claims not only that plaintiff's stipulations before the referee bind him now but, also, that the specific loss provisions of part 2, § 10 of the act are subject to the provisions of part 2, § 9(d), requiring reduction of weekly benefits upon termination of a dependency during the benefit period.

Both parties to this appeal, it should be noted, proceed on the assumption that the specific loss benefits specified in the schedule in part 2, § 10 are subject to the maximum and minimum benefit limitations, determined by the number of claimant's dependents, imposed upon claimants compensated for injuries resulting in incapacity for work which is total, under part 2, § 9(a), and to the identical maximum benefit limitations imposed for such incapacity which is partial, under the first paragraph of part 2, § 10. We do not join in that assumption for we do not read those limitations into the specific loss benefits specified in section 10's schedule.

The schedule of specific loss benefits does not impose any limitation, maximum or minimum, upon the weekly benefit payable for specific losses. If there be such limitations, they must be found elsewhere than in the schedule. It is suggested that the limitations have been incorporated into the schedule of specific losses by the following language which appears in the first sentence of the last paragraph of part 2, § 10:

"The amounts specified in this cause [clause] are all subject to the same limitations as to maximum and minimum as above stated. * * * *"

While part 2, § 9(a), relating to benefits for total incapacity for work, specifies maximum and minimum limitations upon weekly benefits payable, part 2, § 10, specifies no limitations upon the stated benefit rates except only for maximum limitations upon weekly benefits payable for partial incapacity for work. Thus, absent maximum and minimum limitations in section 10, the language quoted above from the last paragraph of section 10, "limitations as to maximum and minimum as above stated" cannot have reference to anything stated in section 10 above that language. It can, however, refer to the maximum and minimum limitations stated in the preceding section of the act, part 2, § 9, and we so hold.

The question remains, however, what "amounts specified in this cause [clause]" are subject to such maximum and minimum limitations? It could be argued that the limitations thus incorporated into section 10 by reference to the limitations of section 9 apply to *all* benefits specified in the entire section 10. That section provides benefits for partial incapacity for work and for specific losses. In addition, and immediately preceding the language we here construe, section 10 contains a definition of

total and permanent disability, compensation for which is provided in the preceding section, section 9.

We cannot read the language to apply section 9's limitations to the benefits provided in section 10 for partial incapacity simply because, had that been the legislature's intent, it could have, and we believe it would have, provided specifically in the first paragraph of section 10, as it did in section 9(a), for minimum limitations as well as for the maximum limitations which expressly appear in that paragraph. We should not attribute to the legislature that ineptitude which would be implicit in our ruling that it intended thus clumsily to incorporate some limitation by reference while simultaneously stating other limitations expressly.

Nor can we read the language to apply to the specific loss schedule of section 10. That schedule does not contain even the maximum limitations specified for partial incapacity claimants in the first paragraph of the section. Indeed the sentence which introduces the schedule of specific loss benefits speaks in terms so positive that it is intrinsically inconsistent with any concept of limitations, maximum or minimum:

"In cases included by the following schedule, the disability in each such case shall be deemed to continue for the period specified, and the compensation so paid for such injury shall be as specified therein, to-wit:   *   *   *   ."

There follows the schedule of losses and the compensation specified in the following form:

"For the loss of a   *   *   *   , 66–2/3% of the average weekly wages during   *   *   *   weeks; *   *   *   ."

We do read the language incorporating maximum and minimum limitations, which we here construe, to apply to those disabilities referred to in the im-

mediately preceding language of section 10, namely, total and permanent disabilities as therein defined and for which compensation is payable as provided in section 9, the very section we hold contains the limitations to which reference is made.

The foregoing construction of the first sentence of the last paragraph of section 10 is entirely consistent with the scheme of compensation designed by the legislature for total incapacity which is not permanent, for total and permanent incapacity, for partial incapacity, and for specific losses of anatomical members. The basic compensation rate for all types of injuries, is 2/3 of the loss of wage-earning capacity. See part 2, §§ 9 and 10. Except for specific loss injuries, for which benefits are paid for loss of the anatomical member as we noted above, maximum limitations determined by the number of claimant's dependents are expressly imposed upon the weekly benefits payable for incapacity for work, whether partial or total and, as to the latter, whether temporary or permanent. But only in the cases of total incapacity for work, where the injured worker theoretically retains no wage-earning capacity, did the legislature impose a minimum weekly benefit limitation, see part 2, § 9(a), in recognition of the need in such cases to provide at least a minimum subsistence level of benefits for that injured employee whose average weekly wage before injury was small. As for those injured employees whose incapacity for work is partial, or who suffer loss of specific anatomical members, and thus who should be able theoretically to earn some wages after injury, the need for a minimum subsistence level of benefits is less apparent and, so, minimum limitations significantly are omitted from the first paragraph of part 2, § 10, and from its schedule of specific losses. Our construction of the first sentence of the last paragraph

of section 10, making it applicable only to the total and permanent disabilities defined in the provisions immediately preceding that sentence, is entirely consistent with the scheme of compensation benefits devised by the legislature, imposing maximum limitations determined by the number of a claimant's dependents upon all weekly benefits except for specific losses and imposing minimum limitations, similarly determined, only upon weekly benefits for total incapacity.

Accordingly, whatever the number of plaintiff's dependents at the time of injury and whatever the subsequent change therein, his weekly specific loss benefit rate is 66-2/3% of his average weekly wages before injury, neither diminished nor enlarged because of the number of his dependents. The stipulations of the parties before the referee, reflecting as they do misinterpretation of the applicable law, do not preclude our disposition of this controversy in accordance with the law as we construe it. See *State Highway Commissioner* v. *Simmons* (1958), 353 Mich 432, 438; *Rousseau* v. *Brotherhood of American Yeomen* (1913), 177 Mich 568, 573; and *Detroit* v. *Beckman* (1876), 34 Mich 125, 126 (22 Am Rep 507). Upon remand, the plaintiff's weekly benefit rate should be recomputed in accordance with the foregoing.

Affirmed in part, reversed in part and remanded for further proceedings. No costs may be taxed, each party having prevailed in part.

DETHMERS, C. J., and KELLY, BLACK, T. M. KAVANAGH, O'HARA, and ADAMS, JJ., concurred.

BRENNAN, J., took no part in the decision of this case.