TEW v HILLSDALE TOOL & MANUFACTURING COMPANY

Docket No. 77853. Submitted January 23, 1985, at Lansing.—Decided
    April 15, 1985.

Plaintiff, Jay W. Tew, injured his foot in an accident in 1968. The
    injury resulted in the loss of a toe and part of another, and he
    was paid workers' compensation benefits for the loss. Since the
    loss he has worn a special orthopedic boot. He has remained
    employed by defendant Hillsdale Tool & Manufacturing Com-
    pany in a variety of jobs, most of which required a great deal of
    standing. Plaintiff sought continued benefits for loss of indus-
    trial use of the foot as a result of the aggravation of subsequent
    employment duties upon the 1968 injury. The Workers' Com-
    pensation Appeal Board held that although plaintiff had suf-
    fered loss of function of the foot he had not indicated that he
    could not continue to use the foot in industry while encased in
    a prosthetic boot and that, therefore, he had not sustained the
    loss of industrial use of the foot. Benefits were denied, and the
    plaintiff appealed by leave granted. *Held:*

    Prosthetic devices are not to be considered in measuring
    disability where the claim is for specific loss benefits. The board
    improperly considered plaintiff's ability to use his foot while
    clad in the special boot. The Court emphasized that this hold-
    ing applies only to claims for specific losses and not to claims
    for total and permanent disability.

    Reversed and remanded for further proceedings.

1. WORKERS' COMPENSATION — APPEAL.
    Findings of fact by the Workers' Compensation Appeal Board are
        subject to limited judicial review, but where the board miscon-
        strues the law the Court of Appeals is free to overturn the
        board's interpretation.

2. WORKERS' COMPENSATION — SPECIFIC LOSS BENEFITS — PROSTHETIC
        DEVICES.
    Corrective prosthetic devices are not to be considered in measur-

REFERENCES FOR POINTS IN HEADNOTES
[1] 82 Am Jur 2d, Workmen's Compensation § 613 *et seq.*
[2] 82 Am Jur 2d, Workmen's Compensation §§ 389, 390.
[3] 82 Am Jur 2d, Workmen's Compensation § 347.

ing an injured worker's disability where the claim is for specific loss benefits; the determination of whether the worker has lost the ability to use his or her injured limb in industry is made by examining the physical condition of the limb.

3. WORKERS' COMPENSATION — SPECIFIC LOSS BENEFITS — LOSS OF INCOME.

The major function of specific loss benefits is that of income replacement; however, to some extent, such benefits are awarded to compensate for physical impairment without regard to actual loss of income.

*Sablich, Ryan, Bobay & Kaechele, P.C.* (by *Theodore P. Ryan),* for plaintiff.

*Smith, Haughey, Rice & Roegge* (by *Lance R. Mather),* for Hillsdale Tool & Manufacturing Company and Lumbermens Mutual Casualty Company.

*Howard & Howard Attorneys, P.C.* (by *Timothy C. Liggett),* for Hillsdale Tool & Manufacturing Company and Liberty Mutual Insurance Company.

Before: SHEPHERD, P.J., and D. E. HOLBROOK, JR. and M. F. SAPALA,* JJ.

SHEPHERD, P.J. Plaintiff appeals by leave granted from the Workers' Compensation Appeal Board's affirmance of a hearing officer's decision denying plaintiff specific loss benefits for loss of industrial use of his right foot. MCL 418.361(2)(j); MSA 17.237(361)(2)(j). We reverse and remand for further proceedings.

In February, 1968, plaintiff's right foot was caught in a conveyor. He received loss benefits for amputation of his great toe. The absence of the toe and a loss of bone and tissue from the second toe combined to increase the strain on the remainder of the foot. In the present proceedings, plaintiff

---

* Recorder's Court judge, sitting on the Court of Appeals by assignment.

claimed loss of industrial use of the foot as a result of the 1968 accident and the aggravating impact of subsequent employment duties.

Plaintiff returned to work in June, 1968. Within two weeks he resumed work as a machine operator, a task which required continuous standing. After two or three years, he bid for and obtained a job which involved operation of four different machines. Although he complained that the special orthopedic boot on his right foot (an ankle-high boot with a specially molded filler to compensate for the loss of tissue) rubbed and irritated the top of his foot and toes, plaintiff held this position for six to seven additional years before obtaining a "partial sitting job" in January, 1977. From early 1979 until August of the same year, plaintiff worked as an "AC balancer", a position requiring more standing than his previous job. Since the injury, plaintiff has been available for and worked overtime.

Plaintiff's foot was examined by three orthopedic surgeons. They each found deformity from the residuals of his injury but differed as to loss of industrial use, necessity for amputation and aggravation from employment activity since the injury.

The Workers' Compensation Appeal Board made the following findings:

"Plaintiff's testimony and the medical findings established that plaintiff has had to make adjustments in his post-injury employment routine because of difficulties with weight bearing. He has persisted despite pain, swelling, vascular and nerve impairment, with weakness of his feet. His functional foot loss was measured at more than 50% by two of the three examining physicians. *Nevertheless, their opinions of a contraindicated performance of continual standing duties were not accompanied by any expressions or history of inability to perform present and past duties while using the*

*injured foot, encased in a prosthetic boot,* that Drs. Schaubel and Kingsley preferred to the amputation and complete prosthesis favored by Dr. Badgley.

*"Plaintiff himself did not indicate that he could not continue to use his foot in industry.* He has not claimed an inability to perform in any of the production positions held since 1968 or attempted to avoid standing assignments. He agreed that his 1977 transfer to a partial sitting job was contemporaneous with a phasing out of his immediate previous job. His present classification requires more standing than 1977-1978 duties, and he was off work from that job only because of an injury sustained at home. All of his jobs, except standing janitorial, salvage, and repair duties, have been achieved through plaintiff's successful bidding." (Emphasis added.)

The board concluded (one member dissenting) that plaintiff had not sustained the loss of "the primary service of the [foot] in industry", citing *Pipe v Leese Tool & Die Co,* 410 Mich 510, 527; 302 NW2d 526 (1981).

"Although findings of fact by the board are subject to limited judicial review, where the board misconstrues the law, this Court is free to overturn its interpretation." *Reece v Consolidated Packaging Co,* 133 Mich App 684, 689; 350 NW2d 308 (1984), *lv den* 419 Mich 959 (1984). Loss of industrial use is "almost automatically" a question of fact. *Pipe, supra,* p 528, quoting *Mitchell v Metal Assemblies, Inc,* 379 Mich 368, 375; 151 NW2d 818 (1967). In this case, however, plaintiff claims that the board erred by considering what he was able to do with the aid of a prosthetic boot rather than without it. Thus, as noted by the dissenting member of the board, this case "presents a somewhat novel issue: whether the degree of functional loss in an industrial loss of use claim is to be assessed with or without consideration of any functional enhancement attributable to the

utilization of corrective prosthetic devices?" We hold that prosthetic devices are not to be considered in measuring disability where the claim is for specific loss benefits. Since the board in this case considered plaintiff's capacity to use his right foot while clad in the special boot, we reverse its decision and remand for further proceedings.

"The determination of whether a worker has lost the ability to use his or her injured limbs in industry is made by examining the *physical condition of the injured limbs, i.e.,* have the limbs been injured to such a degree that their industrial use is lost." *Kidd v General Motors Corp,* 414 Mich 578, 585-586; 327 NW2d 265 (1982) (emphasis added). There must be a showing of either anatomical loss or loss of the primary service of the limb or member in industry. *Pipe, supra,* p 527.

Plaintiff cites the "corrected vision" decisions of the Michigan Supreme Court to support his claim. The Supreme Court has repeatedly held that a claimant's uncorrected vision is determinative of whether he should be awarded specific loss benefits for loss of an eye. *Hakala v Burroughs Corp (After Rem),* 417 Mich 359, 364; 338 NW2d 165 (1983), *Lindsay v Glennie Industries, Inc,* 379 Mich 573; 153 NW2d 642 (1967). Defendants argue that the vision cases have no application here. Defendants note that loss of an eye is statutorily defined as 80 per cent loss of vision, MCL 418.361(2)(l); MSA 17.237(361)(2)(l), a percentage standard absent from the Legislature's treatment of other specific losses. According to defendants, claims for loss of an eye have always been treated in a fashion different from other losses, and there is no precedent for extending the uncorrected vision test to other parts of the body.

We are not persuaded by defendants' argument. Rather, it seems to us that the 80 per cent test

mandated by the Legislature for vision loss results from the relative ease with which an individual's capacity to see can be measured. In cases not involving outright amputation, the loss of other parts of the body cannot be measured with such precision. Restriction of the 80 per cent standard to vision reflects legislative acknowledgment of the limitations of medical measurement. Moreover, we can see no connection in principle between the existence of a percentage standard and whether corrective or prosthetic devices should be considered or not. As for lack of precedent, there is little case authority in either side's favor concerning the issue presented. The other side of the coin is that defendants have cited no appellate court decisions which allow consideration of prosthetic devices in specific loss cases.

Nevertheless, we hesitate to simply apply the uncorrected vision standard of *Lindsey* and *Hakala* to other body parts without giving some guidance for future cases. Defendants argue that adoption of the "uncorrected" standard (or to put it another way, the "without prosthetic device" test) in this case would lead to unreasonable results in many cases.

First, defendants argue that, if plaintiff's claim has merit, then claims of total and permanent disability benefits will have to be judged by the same standard. Defendants urge that the Legislature could not have intended that such a claimant enjoy 800 weeks of benefits regardless of actual income,[1] merely "because he refuses to wear support hose or some other prosthetic device". We find this argument contradictory and unpersuasive. Our holding applies only to claims for specific losses. Even the uncorrected vision test does not

[1] See, MCL 418.351(1); MSA 17.237(351)(1).

extend to total and permanent disability claims. That was the main holding in *Hakala, supra.* At any rate, all specific loss benefits are paid regardless of income. If the claimant refuses to wear a prosthetic device without which he is unable to work, the loss of wages will be the claimant's own. *Kidd, supra,* p 586.

In fact, acceptance of defendants' view might lead to unreasonable results in a great number of cases. As noted below by the dissenting member of the Workers' Compensation Appeal Board:

"If, for example, the claimant had instead suffered a total paralysis of his foot and ankle, thus sustaining the ultimate loss of function short of amputation, should he have been nonetheless precluded from receiving specific loss benefits if, by means of leg braces, he had managed to ambulate and to bear weight despite his catastrophic loss?"

Hence, if we accept the defendants' argument, we would find it rather difficult to limit it to minor prosthetic devices such as support hose or knee braces. In addition, defendants fail to acknowledge that many individuals who wear such minor devices might not be found to have sustained an industrial loss even when the device is not considered. We do not hold that anyone who wears any sort of prosthetic device has a valid specific loss claim, but only that the device should not be considered in measuring the disability.

Defendants also assert that there is no meaningful difference between an external device, such as plaintiff's boot, and an internal one, such as an artificial hip or a pin inserted into a joint. They argue that reversal of the board's decision herein would require the board to ignore any artificial aid which medical science uses to correct the effects of an injury, even if the injury has no lasting effects.

We disagree, as our decision does not go as far as defendents fear.

If by some medical procedure an object or device is attached to or implanted in the injured member, it has become part of the body. The issue of industrial loss would then be viewed with respect to what the claimant can do with the member as altered. We would not require the board to engage in a hypothetical analysis of "the physical condition of the injured [member]", *Kidd, supra,* as it would have been without the newly-added device. In contrast, plaintiff's boot is not part of the foot on which he wears it. Medical science has done nothing to better the condition of the foot itself. An arm or leg which contains a surgically inserted pin is, nevertheless, an arm usable in industry without an external aid.

In *Fogarty v State,* 103 RI 228; 236 A2d 247 (1967), the Rhode Island Supreme Court considered whether the claimant had sustained a loss of a hand. The claimant's thumb was severed, but one of his fingers was surgically attached to the base of the missing thumb. The issue presented was whether the percentage of hand loss should be determined by the hand's condition upon injury or "as of the time when surgery was completed and medical science had accomplished all it could to remedy the damage". 103 RI 229. In holding in favor of the latter approach, the court stated as follows:

"In *Tirocchi*[2] we specifically excluded the use of prosthetic devices as a determinative factor in ascertaining whether post-surgery functional development had reached its maximum potential. The employee, relying on that exclusion, argues that the substitution

---

[2] *Tirocchi v United States Rubber Co,* 101 RI 429; 224 A2d 387 (1966).

of his index finger for a severed thumb should be equated with the furnishing of a prosthetic device. The analogy in our judgment fails. Live tissue from an injured worker's body applied by a skilled surgeon as a replacement for an injured thumb is not equatable with a prosthetic device purchased from a surgical appliance dealer. One is real; the other artificial." 103 RI 231.

We think a similar distinction can and should be made between artificial devices or objects which are made part of the body, and external aids which merely enable a person to accomplish what the limb or member cannot do on its own.

Our conclusion is reinforced by the nature and purpose of specific loss benefits. Though "income replacement remains the major function of specific loss benefits", *Kuty v DAIIE*, 140 Mich App 310; 364 NW2d 315 (1985), recent decisions of the Michigan Supreme Court suggest that specific loss benefits have a broader purpose. In *Redfern v Sparks-Withington Co*, 403 Mich 63, 81; 268 NW2d 28 (1978), the Court observed that "specific losses affect the quality of life apart from wage earning capacity", and that "the impairment of normal function and the effect on the worker's personal life is serious". See, also, *Great American Ins Co v Queen*, 410 Mich 73, 91; 300 NW2d 895 (1980). To some extent, such benefits are awarded to compensate for physical impairment without regard to actual loss of income. 2 Larson, Workmen's Compensation Law, § 57.14(a), pp 10-28 *et seq.* An injured worker may be able to function on the job with the aid of a foreign device, yet still experience deleterious effects on his general way of life.

The board's decision is reversed, but we decline to order payment of specific loss benefits to plaintiff without further findings by the board. The record indicates that plaintiff has sustained a specific industrial loss of his right foot when the boot

is not considered. However, we are not prepared to assume the board's function and determine whether the loss resulted from the 1968 accident or from subsequent, employment-related aggravation. If the loss resulted from the accident, the amount previously awarded for loss of the great toe must be subtracted from the award for the foot. *Magreta v Ambassador Steel Co,* 378 Mich 689; 148 NW2d 767 (1967), *reversed on other grounds on rehearing,* 380 Mich 513; 158 NW2d 473 (1968); *Foster v Detroit,* 56 Mich App 644, 649; 224 NW2d 714 (1974), *lv den* 393 Mich 810 (1975). Accordingly, we remand for additional findings by the board on this issue.

Reversed and remanded for further proceedings consistent with this opinion.